**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leigh Raymond TAMURA,
Defendant-Appellant.**

No. 80–1838.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1981.

Decided Dec. 10, 1982.

George Buehler, Los Angeles, Cal., for defendant-appellant.

John W. Spiegel, Asst. U.S. Atty., Los Angeles, Cal., argued, for plaintiff-appellee; Dean B. Allison, Asst. U.S. Atty., Los Angeles, Cal., on brief.

Before FLETCHER and NORRIS, Circuit Judges, and VON DER HEYDT,* District Judge.

* Honorable James A. Von der Heydt, Chief Judge for the District of Alaska, sitting by designation.

FLETCHER, Circuit Judge:

Leigh Raymond Tamura appeals from his conviction on 59 counts of bribery, mail and wire fraud, conspiracy, racketeering, and Travel Act violations. He contends that the district court prejudicially erred in: (1) refusing to suppress evidence seized during a search of his employer's premises; (2) admitting telex messages that Tamura contends were hearsay; (3) refusing to grant Tamura a brief continuance and to take other steps that Tamura contends were necessary to enable him to meet surprise testimony introduced by the prosecution; and (4) failing to give appropriate jury instructions on the guilty pleas and credibility of the prosecution's two main witnesses. We affirm.

## I

Tamura's conviction stems from a kickback scheme involving his employer, Marubeni America Corporation (Marubeni), an American subsidiary of a Japanese corporation. Marubeni imports telephone cable manufactured by a Japanese corporation, Hitachi Cable, Ltd. Between 1970 and 1978, Marubeni won approximately $9 million in contracts from Anchorage Telephone Utility (ATU) to supply telephone cable to the City of Anchorage, Alaska. ATU is a municipally owned utility that buys cable through competitive bidding. Under ATU's bidding system, bidders must quote a price on every type and size of cable that might conceivably be needed during the contract period, even though only a few of these items will actually be purchased.

By bribing ATU engineer Richard L. McBride, Marubeni and Hitachi Cable were able to rig the bidding. McBride would tell Marubeni and Hitachi which kinds of cable ATU did not plan to purchase. Marubeni would then bid artificially low on these "non-buy" items and thus win the contract even though Marubeni was not the lowest bidder on the items actually purchased.

To get the bribe money to McBride, Marubeni funnelled it through its agent in Anchorage, Forrest J. Ellis, who deducted his share and gave McBride the rest in cash.

The transactions with Ellis were carried out by the nonferous metals department (Metals II Department) of Marubeni's Los Angeles office. Tamura worked as a salesman in the Metals II Department from 1970 until 1975, when he became manager of the department.

In May, 1978, Tamura's secretary discovered the bribery scheme and told the FBI about it. A grand jury indicted Tamura, McBride, Ellis, Marubeni, Hitachi Cable, and Naoto Kudo (an employee of Hitachi Cable). McBride, Ellis, and Hitachi Cable pleaded guilty. Pursuant to plea bargains, McBride and Ellis testified against Tamura and Marubeni, who were tried together and convicted on all counts. Kudo remains a fugitive.

At trial, both Tamura and Marubeni conceded that Marubeni paid large sums to McBride and that McBride provided confidential "non-buy" information in return. Marubeni's defense was that McBride had extorted the payments; Tamura's, that he was unaware of the bribery scheme.

## II

### The Search of Marubeni Offices

On June 8, 1978, thirteen FBI agents entered Marubeni's Los Angeles office with a search warrant. The warrant authorized them to find and seize three categories of records in the Metals II Department and Accounting Department:

1. Records of contracts for the sale of cable from Marubeni to ATU between January 1, 1974 and June 8, 1978.

2. Records of payments to McBride and Ellis during the same four and one-half year period.

3. Records of travel by McBride, Ellis, Tamura, and two other individuals between Los Angeles, Anchorage, and the Republic of Panama for the period February 1, 1976 to June 8, 1978.

To find the relevant records in the accounting department, the agents had to perform three steps: (1) review a computer printout, (2) locate the voucher that corre-

sponded to a particular payment recorded on the printout; and (3) find the check that corresponded to the voucher. After following this procedure for a short time, the agents concluded that it would take a long time to find all the records they were looking for unless Marubeni's employees helped them. But the employees refused to help. The agents then told the employees that if they did not help with the search, the FBI would seize all Marubeni's accounting records for the years in question.

When the employees persisted in their refusal, the FBI agents carried out this threat. In all, they seized 11 cardboard boxes of computer printouts, which were bound in 2000-page volumes; 34 file drawers of vouchers, also bound in 2000-page volumes; and 17 drawers of cancelled checks, which were bundled into files. The agents hauled all these records to another location, where they sifted through them and extracted the relevant documents.

Tamura does not contest the validity of the search warrant. Nor does he assert that the FBI agents searched any areas or files where they did not reasonably expect to find the documents specified in the warrant. He challenges only the scope of the seizure.

When the agents seized all Marubeni's records for the relevant time periods, they took large quantities of documents that were not described in the search warrant. The Government argues that the seizure was reasonable because the documents were intermingled and it was difficult to separate the described documents from the irrelevant ones. Tamura maintains that the

FBI agents either should have remained on the premises until they had extracted all the relevant documents or should have obtained a warrant to seize the additional documents.

It is highly doubtful whether the wholesale seizure by the Government of documents not mentioned in the warrant comported with the requirements of the fourth amendment. As a general rule, in searches made pursuant to warrants only the specifically enumerated items may be seized.[1] *United States v. Honore,* 450 F.2d 31, 33 (9th Cir.1971), *cert. denied,* 404 U.S. 1048, 92 S.Ct. 728, 30 L.Ed.2d 740 (1972) (citing *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1964)). It is true that all items in a set of files may be inspected during a search, provided that sufficiently specific guidelines for identifying the documents sought are provided in the search warrant and are followed by the officers conducting the search. *Cf. United States v. Hillyard,* 677 F.2d 1336, 1340–41 (9th Cir.1982). However, the wholesale *seizure* for later detailed examination of records not described in a warrant is significantly more intrusive, and has been characterized as "the kind of investigatory dragnet that the fourth amendment was designed to prevent." *United States v. Abrams,* 615 F.2d 541, 543 (1st Cir.1980).[2] We cannot sanction the procedure followed by the Government in this case.

In the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, we suggest that the Government and law enforcement officials generally can avoid

---

1. This rule is subject to an exception which permits the seizure of contraband or other incriminating evidence found inadvertently during the execution of a search warrant. *Honore,* 450 F.2d at 33; *Louie v. United States,* 426 F.2d 1398, 1402 (9th Cir.), *cert. denied,* 400 U.S. 918, 91 S.Ct. 180, 27 L.Ed.2d 158 (1970); *United States v. Acree,* 450 F.Supp. 734, 735 (W.D. Okla.1976). *See also Coolidge v. New Hampshire,* 403 U.S. 443, 469–71, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971) (plurality opinion). We do not believe that a second exception, permitting seizures for purposes of administrative convenience, is warranted.

2. *United States v. Beusch,* 596 F.2d 871 (9th Cir.1979), held only that material not described in a search warrant may lawfully be seized when it is contained in the same physical volume, book, or file with other documents known to be covered by the warrant. We do not question this holding. However, the court noted that "we are careful to point out that we are discussing single files and single ledgers, i.e., single items which, though theoretically separable, in fact constitute one volume or file folder. The reasons we have given may not apply to sets of ledgers or files...." *Id.* at 877.

violating fourth amendment rights by sealing and holding the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute's Model Code of Pre-Arraignment Procedure.[3] If the need for transporting the documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting is infeasible and no other practical alternative exists. *See United States v. Hillyard,* 677 F.2d 1336, 1340 (9th Cir.1982). The essen-tial safeguard required is that wholesale removal must be monitored by the judgment of a neutral, detached magistrate.[4] In the absence of an exercise of such judgment prior to the seizure in the present case, it appears to us that the seizure, even though convenient under the circumstances, was unreasonable.

■ We likewise doubt whether the Government's refusal to return the seized documents not described in the warrant was proper. The Government refused to return these documents unless Marubeni stipulated to their authenticity, insisting that it had to leave the documents in their original master

3. Section SS 220.5 of the 1975 ALI Model Code of Pre-Arraignment Procedure reads as follows:
    Execution and Return of Warrants for Documents
        (1) *Identification of Documents to Be Seized.* If the warrant authorizes documentary seizure as specified in Subsection SS 220.2(4), the executing officer shall endeavor by all appropriate means to search for and identify the documents to be seized without examining the contents of documents not covered by the warrant. If such identification is so effected, the documents covered by the warrant shall be seized and dealt with in accordance with the provisions of Subsections SS 220.3(5), (6) and (7) and Section 220.4.
        (2) *Intermingled Documents.* If the documents to be seized cannot be searched for or identified without examining the contents of other documents, or if they constitute items or entries in account books, diaries, or other documents containing matter not specified in the warrant, the executing officer shall not examine the documents but shall either impound them under appropriate protection where found, or seal and remove them for safekeeping pending further proceedings pursuant to Subsection (3) of this Section.
        (3) *Return of Intermingled Documents.* An executing officer who has impounded or removed documents pursuant to Subsection (2) of this Section shall, as promptly as practicable, report the fact and circumstances of the impounding or removal to the issuing official. As soon thereafter as the interests of justice permit, and upon due and reasonable notice to all interested persons, a hearing shall be held before the issuing official, or, if he [has] no jurisdiction, before a judicial officer having such jurisdiction, at which the person from whose possession or control the documents were taken, and any other person asserting any right or interest in the document, may appear, in person or by counsel, and move (a) for the return of the documents

under Article 280 hereof, in whole or in part, or (b) for specification of such conditions and limitations on the further search for the documents to be seized as may be appropriate to prevent unnecessary or unreasonable invasion of privacy. If the motion for the return of the documents is granted, in whole or in part, the documents covered by the granting order shall forthwith be returned or released from impoundment. If the motion is not granted, the search shall proceed under such conditions and limitations as the order shall prescribe, and at the conclusion of the search all documents other than those covered by the warrant, or otherwise subject to seizure, shall be returned or released from impoundment.
        (4) *Handling and Disposition of Seized Documents.* Documents seized shall thereafter be handled and disposed of in accordance with the other provisions of this Article and Articles 280 and 290 hereof. No statements or testimony given in support of a motion made pursuant to this Section shall thereafter be received in evidence against the witness in any subsequent proceeding, other than a prosecution for perjury or contempt in the giving of such statements.

4. In a different context, relating to searches, not seizures, we recently approved a procedure whereby law enforcement officers bring in lay experts as consultants in order to facilitate the on-site search for documents containing complex or technical subject matter. *Forro Precision, Inc. v. IBM Corp.,* 673 F.2d 1045, 1053–54 (9th Cir.1982). *See also United States v. Wuagneux,* 683 F.2d 1343, 1353 (11th Cir.1982) (praising similar procedure as "an attempt by the 'responsible officials . . . to assure that [the search is] conducted in a manner that minimizes unwarranted intrusions into privacy,'" quoting *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976)).

volumes in order to authenticate them at trial. Shortly before trial, the Government obtained the desired stipulations from Marubeni. Although it is unclear exactly when the Government returned the master volumes, the Government kept them for at least six months after locating the relevant documents.

The Government did not need the master volumes to authenticate the documents introduced at trial. The testimony of the agents who removed the documents from their master volumes would have sufficed for this purpose. *See, e.g., United States v. Helberg,* 565 F.2d 993, 997 (8th Cir.1977). Moreover, it was highly improper for the Government to retain the master volumes as a means of coercing Marubeni employees to stipulate to the authenticity of the relevant documents. The Government's unnecessary delay in returning the master volumes appears to be an unreasonable and therefore unconstitutional manner of executing the warrant.

■■■ Regardless of the illegality of the Government's seizure and retention of documents not covered by the warrant, however, reversal is not compelled in this case. All of the documents introduced at trial were seized and retained lawfully because described in and therefore taken pursuant to the valid search warrant. Generally, the exclusionary rule does not require the suppression of evidence within the scope of a warrant simply because other items outside the scope of the warrant were unlawfully taken as well. *See United States v. Daniels,* 549 F.2d 665, 668 (9th Cir.1977). Under the circumstances of the present case, where the Government's wholesale seizures were motivated by considerations of practicality rather than by a desire to engage in indiscriminate "fishing," we cannot say, although we find it a close case, that the officers so abused the warrant's authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed. *Compare United States v. Rettig,* 589 F.2d 418, 423 (9th Cir.1978) (all evidence suppressed where warrant served as pretext to look for

other items not described in it), *with United States v. Heldt,* 668 F.2d 1238, 1259–69 (D.C.Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982) (total suppression unnecessary where executing officers did not abuse or disregard terms of warrant even though they incidentally seized some items not described in it). Nor was the behavior of the officers so unconscionable that it rises to the level of a due process violation. *Cf. United States v. Penn,* 647 F.2d 876, 880–83 (9th Cir.) (en banc), *cert. denied,* 449 U.S. 903, 101 S.Ct. 276, 66 L.Ed.2d 134 (1980). Therefore, the trial court properly admitted the documents described in the warrant.

Because of our resolution of this issue, we do not address the Government's argument that Tamura lacks standing to object to the seizure of his employer's records.

### III

### Admissibility of the Telexes

Marubeni's Tokyo headquarters communicates with its branch offices and subsidiaries around the world through a corporate telex network. To prove Tamura's participation in the bribery scheme, the Government relied mainly on a series of telex messages obtained by subpoena from the files of the Metals II Department for the period after Tamura became manager. The messages, were transmitted between Marubeni's offices in Tokyo, Los Angeles, Anchorage, and Panama. Written in Japanese, they refer to McBride by the code name "Mr. Jones" and to the bribe money by the code number "363." Some of the telexes openly discuss details of the bribery scheme; others use a six-digit number code that was later broken by an FBI cryptographer.

Although Tamura objected that the telexes were inadmissible hearsay, the district court admitted them on three alternative grounds: (1) they fell within the business records exception to the hearsay rule; (2) they were admissible as co-conspirator statements of either Marubeni America Corporation or Marubeni Japan Corpora-

tion; and (3) they were not hearsay because they were not used to assert the truth of their contents. On appeal, Tamura argues primarily that the telexes are not business records. We need not address this issue, as we find that the telexes were admissible on other grounds.

■ Tamura testified that he had authored some of the telexes that originated in the Los Angeles office. These telexes were properly received as admissions of Tamura. Fed.R.Evid. 801(d)(2)(A). As for the other telexes originating in Los Angeles and all those originating in Anchorage, Tamura does not challenge on appeal the trial court's conclusion that they were independently admissible under Fed.R.Evid. 801(d)(2)(E) as co-conspirator statements made in furtherance of the conspiracy. Therefore, he has waived any objection to the admissibility of these telexes.

■ The remaining telexes—those originating in Tokyo and Panama—are not hearsay because they were not offered for the truth of the matters they asserted. Most of the messages from Tokyo were not factual assertions but instructions to employees in the Los Angeles office as to how to carry out and conceal the bribery scheme. To the extent that the Tokyo telexes made factual assertions regarding the details of the bribery scheme, the telexes were relevant for the nonhearsay purpose of refuting Tamura's assertion that he unwittingly carried out the instructions of his superiors in Tokyo without knowing that any bribery was involved. Tamura testified that he routinely read the telexes from Tokyo. Thus, the references in the telexes to bribes and "nonbuy" information tended to show that Tamura knew about the bribery scheme.

There was only one telex from the Panama office. The prosecution introduced it to prove that Tamura knew what he was doing when he went to Panama in 1976, picked up $20,000 in cash, and paid it to McBride on his return. Although Tamura had admitted going to Panama to get the money, he disclaimed any knowledge that the money would be used for bribery. The telex from Panama, which Tamura admittedly received shortly before his trip, refers to "Mr. Jones" and contains an encoded message about the bribe. Thus, it tended to show Tamura's knowledge of the real purpose of his trip.

■ Tamura argues, however, that regardless of the relevancy of the Tokyo and Panama telexes for nonhearsay purposes, they were actually admitted and used to prove the truth of their contents. He points out that the trial court did not instruct the jury that the telexes could not be considered for their truth. Tamura, however, fails to explain how the absence of a limiting instruction could have prejudiced him, even assuming that the telexes do not qualify as business records or as co-conspirators' statements. Because Tamura conceded the existence of the bribery scheme and denied only that he knowingly participated in it, the only manner in which the telexes could have prejudiced him was their use for the nonhearsay purpose of showing his knowledge of the scheme. Hence, we find no abuse of discretion in the admission of this evidence.

## IV

### Surprise Testimony

Tamura asserts that he was unfairly surprised at trial when Ellis testified that Tamura had participated in the formation of the bribery conspiracy in June, 1970. Before trial, the Government had led Tamura to believe that, other than a fairly innocuous letter [5] that Tamura wrote to Ellis on September 2, 1970, the Government had no evidence of his involvement in the conspiracy before he became manager of the Metals II Department in 1975. According to Ellis's pretrial statement, the person in the Metals II Department with whom Ellis negotiated at the beginning of the conspiracy was a Mr. Akimoto, who was then manager of the department.

A month before trial, however, Ellis reread his pretrial statement and told the

---

**5.** The letter merely discusses the accounting and shipping details of a cable delivery to ATU.

prosecutor that it was Tamura, not Akimoto, with whom he first negotiated. The Government did not reveal this new testimony to Tamura until the prosecutor said in his opening statement at trial that Ellis would testify that the kickback scheme had begun with a series of conversations Ellis had with Tamura in June, 1970.

Defense counsel immediately objected, claiming surprise. Tamura moved alternatively for dismissal of the indictment, a mistrial, or a continuance in order to prepare a rebuttal to Ellis's testimony. The court denied these motions, but offered either to prohibit Ellis from testifying about any involvement of Tamura in the conspiracy before September 2, 1970 (the date of Tamura's letter to Ellis) or to allow the testimony with a cautionary instruction. Tamura rejected both these alternatives and insisted on a dismissal, mistrial, or continuance. Because Tamura refused to choose between the two alternatives offered by the court, the court chose for him. It admitted Ellis's testimony with the following instruction:

> [W]ith reference to the conversations just related by [Ellis] between himself and Mr. Tamura in June of 1970, you are instructed that Mr. Tamura is alleged not to have joined any conspiracy until September 2 of that year. Those conversations may not be considered by you in determining whether Mr. Tamura did enter a conspiracy.

Before presenting his case-in-chief, Tamura unsuccessfully moved for permission to rebut Ellis's new testimony by deposing Akimoto and by calling the prosecutor as a witness. On appeal, Tamura contends that the alternatives given him by the court were inadequate to erase the prejudicial effect of the surprise testimony. He argues that the trial court should have granted his motion for a continuance and his motions to depose Akimoto and to put the prosecutor on the stand.

We agree with Tamura that the Government unfairly surprised him.[6] In the pretrial orders for discovery and for bills of particular, the district court unequivocally ordered the Government to disclose before trial its theory concerning when, where, and how Tamura entered the conspiracy so that Tamura would know which witnesses to call. By failing to disclose the change in Ellis's testimony, the Government violated these orders and prejudiced Tamura's opportunity to prepare his defense. *See United States v. Roybal,* 566 F.2d 1109, 1110–11 (9th Cir.1977); *United States v. Lewis,* 511 F.2d 798, 801–03 (D.C. Cir.1975). Tamura's defense that he was unwittingly drawn into the scheme at a late date depended on the absence of evidence linking him to the inception of the scheme. The new testimony that Tamura was involved from the outset called for a new defense strategy and may have required new witnesses. In this case, pretrial disclosure was particularly important because many of the potential witnesses were overseas.

We are not persuaded, however, that the district court abused its discretion by offering to remedy the prejudicial effect of the surprise testimony through either a limiting instruction or exclusion of the testimony, instead of granting the particular remedies that Tamura requested. Tamura points out that Marubeni's defense was that the conspiracy had originated with Ellis and McBride, not with Marubeni employees, and that Ellis and McBride had extorted the bribe money from Marubeni. Exclusion of Ellis's testimony about his alleged conversations with Tamura at the beginning of the conspiracy would have prevented Marubeni from cross-examining Ellis about how the conspiracy began and thus would have blocked Marubeni's extortion defense. Although the success of Marubeni's extortion defense would not have precluded a finding that Tamura was guilty, it would have

---

**6.** Tamura also argues that Ellis's testimony constituted an impermissible variance from the indictment. However, Tamura was convicted of exactly those acts charged in the indictment.

The problem created by the change in Ellis's testimony is that the testimony unfairly surprised Tamura, not that it varied from the indictment.

tended to exculpate him. Therefore, exclusion of Ellis's testimony was not a satisfactory remedy. Nevertheless, the trial judge's decision to give a limiting instruction rather than the remedies Tamura requested was not an abuse of discretion. *See United States v. Sukomolachan,* 610 F.2d 685, 688 (9th Cir.1980); *United States v. Fulton,* 549 F.2d 1325, 1328–29 (9th Cir. 1977).

### A.  Denial of a Continuance

Tamura told the trial court that the reason he needed a continuance was to interview witnesses in Japan who might contradict Ellis's new testimony. When it denied the continuance, the district court indicated that it would reconsider if Tamura specified the witnesses he needed to interview and how much time he needed for each one. Except for Tamura's request to depose Akimoto, which is discussed separately below, Tamura never made the specific showing requested by the court.

■ It was the responsibility of the defense counsel to demonstrate the need for a continuance to prepare to meet the new testimony. *See United States v. Espericueta-Reyes,* 631 F.2d 616, 623 (9th Cir.1980). That the new testimony was damaging to Tamura is immaterial; defense counsel had to show the trial court that without a continuance he had inadequate time to prepare a defense to the testimony. *Id.* The district court has broad discretion to select an appropriate remedy for surprise caused by the Government's failure to comply with discovery orders. *Fulton,* 549 F.2d at 1328; *see also United States v. Dipp,* 581 F.2d 1323, 1327 (9th Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979); *United States v. Williams,* 493 F.Supp. 599, 602–03 (D.Md.1979). In light of Tamura's failure to make a specific showing of prejudice from the denial of a continuance, we cannot say that the court abused its discretion in denying the continuance.

### B.  Denial of Motion to Depose Akimoto

In his motion to depose Akimoto, Tamura asserted that Akimoto, a Japanese citizen, was in Canada and that he refused to come to the United States to testify for fear of arrest; however, Akimoto was willing to be deposed in Canada. Akimoto would allegedly testify that it was he, not Tamura, who negotiated with Ellis in 1970 and that all Tamura did was carry out Akimoto's instructions to set up a meeting between Akimoto and Ellis. He would testify that Tamura never spoke with him in 1970 about bid-rigging or bribes. Tamura requested a delay of only a day or two to take the deposition.

■ The district court in a criminal trial may order that a prospective witness be deposed when it is in the interests of justice to do so because of exceptional circumstances. Fed.R.Crim.P. 15(a); *United States v. Richardson,* 588 F.2d 1235, 1241 (9th Cir. 1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). Although the rule rests broad discretion in the district court, the court may have abused that discretion here. It is unlikely that the curative instruction completely eliminated the prejudicial effect of Ellis's testimony that Tamura was one of the instigators of the bribery scheme. In addition, if Akimoto had been allowed to contradict Ellis's testimony on this point, this contradiction would have cast doubt on Ellis's testimony about Tamura's activities after formation of the conspiracy.

Nevertheless, any error in denying the motion to depose Akimoto was harmless beyond a reasonable doubt.[7] The case did not turn on Ellis's testimony. Rather, Tamura's own testimony and the documents from his office files provided overwhelming evidence of his guilt. Tamura admitted that while manager of the Metals II De-

---

**7.**  For this reason, we do not decide whether the denial of the motion was proper on the ground that Akimoto was a fugitive co-conspirator. *See United States v. Richardson,* 588 F.2d 1235, 1241 (9th Cir.1978); *United States v. Murray,* 492 F.2d 178, 195 (9th Cir.1973), *cert. denied,* 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974). *But see United States v. Wilson,* 601 F.2d 95, 98–99 (3d Cir.1979).

partment, he regularly read incoming and outgoing telexes regarding the ATU cable contracts, and that he wrote several outgoing telexes that discussed the bribery scheme. As the trial court commented at sentencing, Tamura's testimony that, notwithstanding the contents of the telexes, he did not know about any payoffs to McBride, was patently incredible.[8]

## C. Denial of Motion to Call the Prosecutor as a Witness

Tamura argues that he should have been allowed to call the prosecutor to testify that Ellis had materially changed his statement shortly before trial. At the oral argument on Tamura's motion for a mistrial, the prosecutor stated the following outside the presence of the jury: The first time the Government interviewed him, Ellis had seemed unsure whether the first person he negotiated with was Tamura or Akimoto. When Ellis named Tamura a month before trial, the prosecutor was "skeptical about this sudden change from Akimoto to Tamura," and he told Ellis "to go back and think real hard about who you talked to and when." A week later, Ellis returned and confirmed that it was Tamura.

Tamura wished to have the prosecutor repeat these statements on the witness stand in order to impeach Ellis. Ellis had testified that his statement and recollection had never changed; the Government had simply not asked him the right questions. He maintained that the first time he was interviewed, he was asked to identify the "principal person" he had dealt with and he had therefore named Akimoto. Later, Ellis complained to the prosecutor that the FBI's summary of that interview implied that Akimoto was the only person he had had conversations with. He told the prosecutor that the first person he had talked with was Tamura.

■ The federal courts have universally condemned the practice of a government prosecutor's testifying at a trial in which he is participating; such testimony is

permitted only if required by a compelling need. *United States v. Schwartzbaum,* 527 F.2d 249, 253 (2d Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1410, 47 L.Ed.2d 348 (1976); *see United States v. Birdman,* 602 F.2d 547, 553 (3d Cir.1979), *cert. denied,* 445 U.S. 906, 100 S.Ct. 1084, 63 L.Ed.2d 322 (1980) (collecting cases). No compelling reasons exist here. As the trial court noted, the prosecutor could not properly testify that Ellis had seemed unsure of his story and that the prosecutor had been skeptical; these were merely the prosecutor's opinions about Ellis's credibility. The prosecutor's account of what he and Ellis had actually said during the interviews in question was consistent with Ellis's testimony in every respect except one. On cross-examination Ellis had denied that the prosecutor had told him to "go back and think real hard" about his testimony. To impeach Ellis on this point, the trial court admitted into evidence a stipulation that if the prosecutor were to testify, he would state that he had told Ellis to go back and think really hard. Because this was the only point on which the admissible portions of the prosecutor's statements at oral argument diverged from Ellis's testimony, Tamura had no compelling need to call the prosecutor.

## V

### Jury Instructions

■ Tamura contends that the trial court committed reversible error by admitting into evidence the guilty pleas of Ellis and McBride without instructing the jury on the limited purpose for which the pleas could be used. The fact that a co-defendant has pleaded guilty to the offense for which the defendant is on trial may be used to evaluate the co-defendant's credibility as a witness, but it may not be used as substantive evidence of the defendant's guilt. *United States v. Halbert,* 640 F.2d 1000, 1006 (9th Cir.1981). In this case, the trial

---

**8.** For example, Tamura testified that his use of the code name "Jones" for McBride in a telex

he had written was merely a "typographical error."

court gave no instruction on the proper use of Ellis's and McBride's guilty pleas. It did instruct, however, that:

[d]efendant Hitachi Cable, Ltd. and Naoto Kudo are not before you in this case. You should not speculate as to the reasons for this fact. It should not control or influence your verdict with reference to the remaining defendants. You must base your verdict as to each of the remaining defendants solely on the evidence against each.

Tamura argues that the failure to mention Ellis and McBride in this instruction implied that the jury *could* consider their guilty pleas in deciding whether Tamura was guilty.

■ At trial, however, the court asked Tamura's attorney at least five times whether he had any objections or amendments to this instruction. Not only did Tamura's attorney fail to request any instruction on Ellis's and McBride's guilty pleas but he expressly consented to the instruction that was given on the two absent defendants. Upon reviewing the record, we are convinced that the court did not commit plain error by failing to give a sua sponte instruction on the use of guilty pleas. It was the defense counsel who brought the guilty pleas to the jury's attention when in Marubeni's opening statement and on Tamura's cross-examination of Ellis the defense sought to impeach Ellis and McBride through their plea agreements. The prosecutor properly introduced the plea agreements into evidence in order to blunt the defense efforts at impeachment. The prosecutor did not emphasize the guilty pleas or suggest that they were evidence of Tamura's guilt. These circumstances do not establish plain error. *See United States v. Anderson,* 642 F.2d 281, 286 (9th Cir. 1981); *United States v. King,* 505 F.2d 602, 605–09 (5th Cir.1974).

■ Tamura also contends that the trial court should have instructed the jury to weigh the testimony of Ellis and McBride "with great care" because both were "admitted perjurers." According to Tamura, the two committed perjury when they lied on their tax returns about the bribes they received from Marubeni. An essential element of the crime of perjury is that the perjurer have "taken an oath before a competent tribunal, officer, or person . . . that he will testify, declare, depose, or certify truly." 18 U.S.C. § 1621 (1976); *see United States v. Arias,* 575 F.2d 253, 254 (9th Cir.), cert. denied, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). Although the penalty for filing a false return is the same as that imposed for perjury, the filing of a tax return does not require taking "an oath before a competent tribunal." *See* 26 U.S.C. § 6065 (1976). Therefore, the filing of a false tax return is not perjury, and the perjury instruction requested by Tamura was inappropriate.

■ Even if the instruction had been appropriate, the failure to give it was not prejudicial. The instructions given on the testimony of accomplices and on impeachment by prior inconsistent statements and by felony convictions adequately cautioned the jury that the credibility of Ellis and McBride was open to question. *See United States v. Allen,* 579 F.2d 531, 533 (9th Cir.), cert. denied, 439 U.S. 933, 99 S.Ct. 326, 58 L.Ed.2d 329 (1978); *United States v. Polizzi,* 500 F.2d 856, 878 (9th Cir.1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

The judgment of conviction is AFFIRMED.