CALLAHAN, Circuit Judge,
with whom IKUTA, Circuit Judge, joins, concurring in part and dissenting in part from the en banc panel’s per curiam opinion:
I initially express my concerns with the proposed guidelines for searches of electronically stored data that are set forth in the Chief Judge’s concurring opinion. The concurrence is not joined by a majority of the en banc panel and accordingly the suggested guidelines are not Ninth Circuit law. Nonetheless, although they are only suggestions, there are sound reasons for declining to follow them. In Section B of this dissent, I reiterate my objections to the majority’s opinion as set forth in my concurring and dissenting opinion to Chief Judge Kozinski’s initial opinion for the majority of the en banc panel. United States v. Comprehensive Drug Testing, Inc., 579 F.3d 989 (9th Cir.2009) (en banc).
A.
As noted in my dissent from our initial en banc opinion, the breadth of the proposed guidelines for future digital evidence cases raises several serious concerns. Although I appreciate the desire to set forth a new framework with respect to searches of commingled electronic data, I remain wary of this prophylactic approach. The prescriptions go significantly beyond what is necessary to resolve this case.
Furthermore, the proffered “guidelines” are troubling because they are over-broad, unreasonably restrictive of how law enforcement personnel carry out their work, and unsupported by citations to legal authority. For example, the concurring opinion does not explain why it is now appropriate to grant heightened Fourth Amendment protections in the context of searches of computers based on the nature of the technology involved when we have previously cautioned just the opposite. See United States v. Giberson, 527 F.3d 882, 887-88 (9th Cir.2008) (declining to impose heightened Fourth Amendment protections in computer search cases as a result of a computer’s ability to store large amounts of potentially intermingled information, and stating that such heightened protections must be “based on a principle that is not technology-specific”).
The concurring opinion also fails to acknowledge that its proffered guidance conflicts with the amendments to Federal Rule of Criminal Procedure 41(f)(1)(B), effective December 1, 2009. For instance, Rule 41(f)(1)(B) now states that in cases where an officer is seizing or copying electronically stored information, “[t]he officer may retain a copy of the electronically stored information that was seized or copied.” This provision directly contradicts the suggestion that “[t]he government should not retain copies of such returned data.” Cone. Op. at 1179. Similarly, Rule 41(f)(1)(B) now provides that “[i]n a case involving the seizure of electronic storage media or the seizure or copying of electronically stored information, the inventory may be limited to describing the physical storage' media that were seized or copied.” The concurring opinion, however, suggests that “the government should provide the issuing officer with a return disclosing precisely what it has obtained as a consequence of the search, and what it has returned to the party from whom it was seized.” Cone. Op. at 1179. Presumably these suggestions are superseded by the detailed amendments to Rule 41, which provide comprehensive guidance in this area.
In addition, the suggested protocols essentially jettison the plain view doctrine in *1184 digital evidence cases, urging that magistrate judges “insist that the government waive reliance upon the plain view doctrine in digital evidence cases.” [1] Cone. Op. at 1180. This is put forth without explaining why the Supreme Court’s case law or ornease law dictates or even suggests that the plain view doctrine should be entirely abandoned in digital evidence cases. Instead of tailoring its analysis of the plain view doctrine to the facts of this case, the concurring opinion takes the bold, and unnecessary step of casting that doctrine aside. The more prudent course would be to allow the contours of the plain view doctrine to develop incrementally through the normal course of fact-based case adjudication. A measured approach based on the facts of a particular case is especially warranted in the case of computer-related technology, which is constantly and quickly evolving.
Moreover, the concurring opinion offers no legal authority for its proposal requiring the segregation of computer data by specialized personnel or an independent third party. See Conc. Op. at 1178-79, 1180. Also, the proposed ex ante restriction on law enforcement investigations raises practical, cost-related concerns. With respect to using an in-house computer specialist to segregate data, the suggestion essentially would require that law enforcement agencies keep a “walled-off,” non-investigatory computer specialist on staff for use in searches of digital evidence. To comply, an agency would have to expand its personnel, likely at a significant cost, to include both computer specialists who could segregate data and forensic computer specialists who could assist in the subsequent investigation. The alternative would be to use an independent third party consultant, which no doubt carries its own significant expense. Both of these options would force law enforcement agencies to incur great expense, perhaps a crushing expense for a smaller police department that already faces tremendous budget pressures.
In sum, although the suggestions are well-intentioned, they certainly are not legally compelled and their adoption would create more problems than it would solve. Certainly the Chief Judge and my colleagues who have joined his concurring opinion may express their opinions on future protocols; however, their suggestions should not be confused with the en banc court’s opinion which, although I dissent from it, is properly confined to the issues required to decide the appeal.
B.
I agree with the majority that the government’s appeal from the Cooper Order[2] was untimely and that the appeal in case number 05-55354 should be dismissed. I disagree, however, with the majority’s conclusion that the findings stated in the Cooper Order or the Illston Order have dis-positive preclusive effect with respect to this court’s review of the Mahan Order. Setting aside the Cooper Order and the Illston Order, I would reverse the Mahan Order on the merits. In addition, I would vacate and remand the Illston Quashal. *1185 Accordingly, I respectfully dissent, in part, from the per curiam opinion.
I.
The majority holds that with respect to this court’s review of the findings and conclusions stated in the Mahan Order, the government is bound by the factual and legal determinations contained in the Cooper Order and the Illston Order. P.C. Op. at 1169-70. Based on the collateral estoppel or issue preclusive effect of these orders, the majority upholds Judge Mahan’s findings that “ ‘[t]he government callously disregarded the affected players’ constitutional rights,” and that it “unreasonably] ... refuse[d] to follow the procedures set forth in United States v. Tamura ... upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at [Comprehensive Drug Testing (“CDT”)] were intermingled with records for other athletes not named in those warrants.’ ” Id. at 1170 (internal quotation marks omitted, alterations in original). Neither the Cooper Order nor the Illston Order has preclusive effect over our review of the Mahan Order, and I address each order in turn.
I disagree that the Cooper Order has preclusive effect with respect to the Mahan Order. The problem is a temporal one — the Cooper Order, entered October 1, 2004, does not have preclusive effect over this court’s review of the Mahan Order because it was entered after the Mahan Order, which was entered September 7, 2004.
The single ease that the majority relies on for its application of the issue preclusion doctrine, Steen v. John Hancock Mutual Life Insurance Co., addressed whether issues decided in an earlier decision had a preclusive effect in a subsequent decision. See 106 F.3d 904, 908-09 (9th Cir.1997). Steen does not support the proposition that a later-in-time order has a retroactive preclusive effect on an earlier one.[3] Although this case presents a peculiar backdrop for the application of the issue preclusion doctrine, our decision in Nationwide Mutual Insurance Company v. Liberatore, 408 F.3d 1158 (9th Cir.2005), is instructive. Liberatore was a member of the U.S. Navy who was traveling on orders and picked up his friend, Ivey, for a social evening during his trip. Liberatore drank and drove, causing a traffic accident in which Ivey suffered serious injuries. The accident resulted in two lawsuits: (1) Ivey’s negligence action against Liberatore, the rental car company, and the United States; and (2) a declaratory relief action by Nationwide, Liberatore’s insurance company, against Liberatore, the United States, the rental car company, and Ivey. In Ivey’s negligence lawsuit, the government moved for summary judgment on the grounds that Liberatore was not acting within the scope of his employment and thus there was no waiver of sovereign immunity under the Federal Tort Claims Act. In Nationwide’s lawsuit, Nationwide moved for summary judgment on the grounds that insurance coverage did not exist because Liberatore was acting within the scope of his employment and thus the government had indemnification responsibility; the government also filed a motion to dismiss for lack of subject matter jurisdiction. The central question in both law *1186 suits was the scope of Liberatore’s employment. See id. at 1160-61.
The district court granted the government’s motion for summary judgment in Ivey’s negligence action, and that order was not appealed. On the same day, and through a separate order, the district court denied the government’s motion to dismiss and denied Nationwide’s motion for summary judgment. On appeal in the Nationwide action, the government argued that Nationwide was bound by the decision in the Ivey action that Liberatore was not acting within the scope of his employment duties at the time of the accident, which was contrary to the position taken by Nationwide in its lawsuit. We rejected this attempted application of the issue preclusion doctrine, stating that “[although a district court judgment carries preclusive effect going forward, it cannot operate to bar direct review of an extant judgment.” Liberatore, 408 F.3d at 1162 (citing Orion Tire Corp. v. Goodyear Tire & Rubber Co., 268 F.3d 1133, 1136 (9th Cir.2001) (holding that appeal could not be barred by claim preclusion based on a judgment that postdated the judgment on appeal)). We thus held that Nationwide was not precluded from arguing on appeal in the Nationwide case that Liberatore acted within the scope of employment, and we decided that issue on the merits. Id. (stating that “a decision entered coincident with the judgment on appeal, just as a judgment entered after the judgment on appeal, ‘can scarcely constitute a bar to the instant action’ ” (citation omitted)).
Here, the majority’s use of the later-decided Cooper Order to preclude or limit review of the earlier-decided Mahan Order is contrary to our well-reasoned opinions in Liberatore and Orion Tire.[4] Therefore, I would review the Mahan Order without giving issue preclusive effect to the Cooper Order.
Although the majority’s analysis of the Illston Order does not suffer from the temporal flaw presented by the Cooper Order, its reliance on the preclusive effect of the Illston Order is also questionable. First, the Illston Order dealt with the April 30, 2004 warrant that the government presented to Judge Lloyd to search flies in the government’s possession, not the April 7, 2004 warrants that sought to search CDT and Quest Diagnostics, Inc. (“Quest”). This raises a concern about the scope of preclusion in terms of what was actually decided in the Illston Order. Second, the majority relies on the Illston Order to uphold Judge Mahan’s finding that the government refused to follow the procedures set forth in United States v. Tamura, 694 F.2d 591, 596 (9th Cir.1982). P.C. Op. at 1170. But Judge Illston did not make a clear finding regarding the government’s adherence to Tamura. Finally, the majority upholds Judge Mahan’s finding that “the government callously disregarded the affected players’ constitutional rights” based on the Illston Order. Id. However, whereas Judge Illston’s “callous disregard” finding was almost entirely premised on the government’s issuing subpoenas and seeking search warrants in different district courts, Judge Mahan’s finding appears to be premised on the government’s adherence to the Tamura procedures. At a minimum, the use of a tool as powerful as issue preclusion in the *1187 context of such disparities is unwise, especially where Judge Mahan did not rule on the preclusive effect of the Illston Order. Accordingly, I would review the Mahan Order without reliance on the Illston Order.
II.
Regarding the Mahan Order, I agree with the three-judge panel majority’s thorough analysis and conclusions that (1) the district court properly exercised its equitable jurisdiction under Ramsden v. United States, 2 F.3d 322 (9th Cir.1993); (2) the government did not display a callous disregard for the constitutional rights of others in conducting its seizure of the materials from CDT, which gave rise to Judge Mahan’s decision and order to return the materials seized from Quest; and (3) that it was not reasonable under all the circumstances for the district court to order the return of the subject property under Federal Rule of Criminal Procedure 41(g). See United States v. Comprehensive Drug Testing, Inc., 513 F.3d 1085, 1103-13 (9th Cir.2008). I do not restate those points here, but write to highlight aspects of my disagreement with the per curiam opinion’s resolution of the Mahan Order.
Judge Mahan’s decision with respect to the return of materials seized from Quest in Las Vegas, Nevada, on April 8, 2004 was premised on his view that these materials were poisonous fruit which acquired their taint as a result of the government’s seizure of intermingled materials from CDT in Long Beach, California. The majority here does not appear to take issue with the government’s physical seizure and removal of the intermingled materials from CDT, including a copy of the “Tracey directory.” Consistent with our recommendation in Tamura, the government, anticipating that it might encounter intermingled relevant and non-relevant evidence in its search of CDT’s computers and that an on-site search might not be feasible, crafted its April 7, 2004 warrant to provide for seizure and removal of such intermingled evidence for offsite review. See 694 F.2d at 596 (“If the need for transporting documents is known to the officers prior to the search, they may apply for specific authorization for large-scale removal of material.... ”). Our subsequent decisions in the computer context have approved of the seizing of units that contain information authorized for seizure and information not described in the warrant where an on-site search is infeasible. See Giberson, 527 F.3d at 889-90 (holding that seizure of suspect’s computer was justified, despite the potential for intermingling of relevant and non-relevant material, based on the officers’ reasonable belief that items enumerated in the search warrant could be found therein); United States v. Hill, 459 F.3d 966, 975-76 (9th Cir.2006) (stating that wholesale seizure of materials is permissible where affidavit in support of warrant provides a reasonable explanation for why such a seizure is necessary); United States v. Adjani, 452 F.3d 1140 (9th Cir.2006) (finding permissible the removal for off-site search of a suspect’s computer along with the computer of a woman living with the suspect who was not identified in the warrant).
Apart from the government’s arguments related to the plain view doctrine, I interpret the majority’s primary concern to be Agent Novitsky’s search of the Tracey directory after it was removed from CDT’s premises.[5] See P.C. Op. 1171-72. The *1188 majority focuses on statements made by Assistant United States Attorney Nedrow at the hearing before Judge Mahan that the idea behind taking the Tracey directory was to provide Agent Novitsky with an opportunity to “briefly peruse it to see if there was anything above and beyond that which was authorized for seizure in the initial warrant.”[6] P.C. Op. at 1171. Although Nedrow’s language is troubling on its face, Agent Novitsky acted with the reasonable purpose of learning the location of the relevant material in the Tracey directory. Upon encountering other potentially incriminating material in the Tracey directory, he sought a subsequent warrant. We have previously found this approach acceptable. See Giberson, 32.1 F.3d at 889-90 (holding that the district court properly denied the motion to suppress evidence of child pornography found on a copied computer hard drive during a search for evidence of the production of false identification cards pursuant to a valid warrant); Adjani, 452 F.3d at 1151 (“There is no rule ... that evidence turned up while officers are rightfully searching a location under a properly issued warrant must be excluded simply because the evidence found may support charges for a related crime (or against a suspect) not expressly contemplated in the warrant.”). Therefore, the majority’s determination that the government’s actions in this case were inconsistent with Tamura is inconsistent with our case law.
In addition, the majority reads the warrant to state that the computer specialist, and only the computer specialist, was permitted to conduct the initial review of the commingled evidence seized from CDT. From this premise, the majority concludes that Agent Novitsky’s involvement in that initial review of the seized materials constituted “deliberate over-reaching.” See P.C. Op. at 1172. But, as the majority of the three-judge panel stated, the warrant did not expressly limit the initial review to the computer specialist. Comprehensive Drug Testing, 513 F.3d at 1111. It provid *1189 ed that the computer specialist would be involved in the determination of whether on-site review of the computer files was feasible and in the segregation process. It did not, however, by its terms exclude other case agents. The majority calls reliance on the lack of any explicit exclusion in the warrant “sophistry,” arguing that “the representation in the warrant that computer personnel would be used to examine and segregate the data was obviously designed to reassure the issuing magistrate that the government wouldn’t sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize.” P.C. Op. at 1172. However, that is an inference drawn by the majority and is but one of several reasonable inferences.[7] The record does not indicate precisely why that language was included in the warrant. The computer specialist may have been included to facilitate the search and segregation efforts, to ensure that data would not be destroyed, to assist in the navigation through the computer files, or to uncover any mislabeled or hidden files. These purposes do not necessarily require exclusion of all other case agents.
Even assuming some overreaching by the government, I would conclude that the return of the property pursuant to Rule 41(g) is not necessarily the appropriate relief in this case. The Advisory Committee Notes to the 1989 Amendments to Rule 41 state that “reasonableness under all of the circumstances must be the test when a person seeks to obtain the return of property.” See also Ramsden, 2 F.3d at 326. These notes further state that “[i]f the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable.” Fed.R.Crim.P. 41, Advisory Committee Notes to 1989 Amendments (referring to then-existing Rule 41(e)). In Ramsden, we stated that “[t]he United States’ retention of the property generally is reasonable if it has a need for the property in an investigation or prosecution.” 2 F.3d at 326; see also United States v. Fitzen, 80 F.3d 387, 388 (9th Cir.1996) (“Generally, a Rule 41(e) motion is properly denied ‘if ... the government’s need for the property as evidence continues.’ ”) (quoting United States v. Mills, 991 F.2d 609, 612 (9th Cir.1993)). The government stated in its briefs and at oral argument that it has a continuing need for the seized property in connection with its ongoing investigation into the distribution of illegal steroids in professional baseball. Judge Mahan’s order did not address this government need. At a minimum, a remand is warranted to develop this issue in the district court in the first instance.
Furthermore, I would find that the government’s conduct in this case is not sufficiently egregious, in light of our case law, to warrant an order that the government return the seized property without retaining copies for its investigatory purposes.[8] Our decision in Ramsden, 2 F.3d 322, is illustrative. There, deputy U.S. marshals *1190 executed a provisional arrest warrant for Ramsden at his hotel room. The marshals asked Ramsden to enter the hallway and then arrested him. When the marshals accompanied Ramsden back into the hotel room to retrieve some clothes, the marshals seized documents contained in a closed briefcase. They made this warrant-less seizure despite having the opportunity to obtain a search warrant and conceded before the district court “that the search and seizure violated Ramsden’s Fourth Amendment rights.” Id. at 325. We held that the district court properly invoked its equitable jurisdiction under then-numbered Rule 41(e) and upheld the district court’s conclusion that the marshals had demonstrated a callous disregard for Ramsden’s constitutional rights. Id. at 325-27. Although we affirmed the district court’s order that the government return the original documents to prevent Rams-den from suffering harm to his business, we allowed the government, in what the majority here calls a “compromise solution,” to retain a copy of the documents for ongoing investigative purposes. See id. at 327; see also P.C. Op. at 1173-74.
Assuming that the government overreached in this case, its conduct was not as egregious as the marshals’ conduct in Ramsden, where the government was permitted to retain a copy of the documents ordered to be returned. Unlike the warrantless search conducted in Ramsden, the government sought and received valid search warrants in this case, but then arguably erred in its execution of the warrants. Under these circumstances, Rams-den counsels a compromise solution as contemplated by Rule 41(g). Accordingly, I disagree with the majority’s decision to affirm the Mahan Order.
III.
Finally, I would vacate and remand the Illston Quashal. Judge Illston quashed the two subpoenas served on Quest and CDT on the grounds that their issuance constituted harassment and abuse of the grand jury process and was unreasonable under Federal Rule of Criminal Procedure 17(c). In essence, she stated two reasons for quashing the subpoenas: (1) the subpoenas “served as an unreasonable insurance policy” for materials that the government had already seized through the use of search warrants; and (2) the government impermissibly executed a series of search warrants in three different districts once it learned that CDT would move to quash the January and March subpoenas, which was a “tactical decision” designed to prevent Judge White from ruling on the earlier-served subpoenas. Judge Illston stated that the government’s tactical decision was unreasonable and constituted harassment.
Judge Illston’s decision was based, in part, on the legal error that the government may not simultaneously seek the same information through grand jury subpoenas and search warrants. The majority agrees that this is legal error. See P.C. Op. at 1175 (“It isn’t per se unreasonable to conduct an investigation using both search warrants and subpoenas.”). Our case law allows the simultaneous use of warrants and subpoenas in light of the substantial differences between these devices, e.g., the differing levels of intrusion on a person’s privacy, the ability and manner of challenging each device. See In re Grand Jury Subpoenas Dated Dec. 10, 1987, 926 F.2d 847, 854-55 (9th Cir.1991) (upholding the validity of grand jury subpoenas served at the same time as “functionally equivalent” search warrants, where officers allegedly sought to enforce the subpoenas through immediate seizure of the materials at issue). Accordingly, Judge Illston’s conclusion that the subpoe *1191 nas were unreasonable is infected by her misapprehension that the law did not provide for the simultaneous use of warrants and subpoenas.
This legal error also underlies Judge Illston’s determination that the government made an unreasonable tactical decision to pursue search warrants in different districts in an attempt to “prevent” Judge White from ruling on earlier-issued subpoenas.[9] But, as the preceding discussion indicates, the government was entitled to seek parallel search warrants and subpoenas, and the use of those- devices is judged by different standards. Therefore, as the three-judge panel majority concluded, the government could have sought the search warrants notwithstanding the motion to quash the subpoenas pending before Judge White, and even if Judge White had quashed the subpoenas. See Comprehensive, 513 F.3d at 1114-15.
In addition, Judge Illston gleaned the government’s intent behind the issuance of the subpoenas — in her view to harass CDT and Quest — based on its contemporaneous seeking of a series of search warrants. The hearing transcript indicates that Judge Illston was focused on the government’s motivations and placed the burden on the government to provide “a substantial explanation” for both executing search warrants and issuing subpoenas, implying that doing so gave rise to a presumption of bad faith. From the existing record, it is difficult to discern the government’s actual motive behind issuing the May 6th subpoenas. In any event, as indicated, the government was not obligated to provide an explanation for its decision to use two types of investigatory tools at its disposal.
Finally, the prejudice to the government from Judge Illston’s misconception of the law may be seen in her failure to analyze the propriety of the subpoenas under the correct legal standard. A district court may quash or modify a subpoena “if compliance would be unreasonable or oppressive.” Fed.R.Crim.P. 17(c)(2) (emphasis added); see also United States v. Bergeson, 425 F.3d 1221, 1224 (9th Cir.2005). For example, a district court may quash a subpoena when compliance would destroy a valid privilege, see Bergeson, 425 F.3d at 1225, when the subpoena seeks material that is outside of the scope of a legitimate grand jury investigation, see In re Grand Jury Subpoenas Dated Dec. 10, 1987, 926 F.2d at 854, or when the subpoena would compel a person to incriminate himself or would violate a legitimate privacy interest of the person served. See United States v. Calandra, 414 U.S. 338, 346, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).
Here, Judge Illston focused on the contemporaneous use of subpoenas and search warrants, which is not improper, and the government’s related conduct,[10] but did not identify what aspect of the subpoenas would render compliance “unreasonable or oppressive.”[11] She did not, for example, base her decision on a finding that the *1192 subpoenas exceeded the legitimate scope of the grand jury’s investigation or that compliance would violate some valid privilege. Judge Illston’s reasons for quashing the subpoenas were infected by the erroneous view that the government is not entitled to employ parallel warrants and subpoenas. As a result, the Illston Quashal should be vacated and remanded for an explanation that is not based on that premise.
IV.
I disagree with the majority’s conclusion that the Cooper Order and the Illston Order are entitled to issue preclusive effect in connection with our review of the Mahan Order. On the merits of the Mahan Order, I would reverse Judge Mahan’s decision because the government acted reasonably in searching the Tracey directory. Even assuming that the government overreached, the district court’s order for the wholesale return of property failed to account for the government’s ongoing need for the information, a valid consideration when evaluating a motion under Rule 41(g). Finally, because Judge Illston appears to have misapprehended the propriety of the government using both warrants and subpoenas, I would vacate the Illston Quashal and remand for further explanation or proceedings. Accordingly, I respectfully dissent.

. Although the suggestion is framed in terms of what a magistrate “should insist,” the practical effect of this proposal — were it to be adopted as law — would be to prescribe a mandatory procedure. The creation of a "safe harbor” (Cone. Op. at 1177-78), implicitly warns judges and lawyers of the perils of any other approach.

. For ease of reference, I adopt the majority’s definition conventions as to the orders referred to in the majority opinion: the Cooper Order, the Mahan Order, the Illston Order, and the Illston Quashal.

. The language from Steen cited by the majority discusses the circumstances under which issue preclusion extends to principles of law. For example, a legal principle applied in an earlier action may have a preclusive effect in a later action if the factual scenario in the earlier and later action are the same. Steen, 106 F.3d at 913 & n. 5. Steen does not support the proposition that a decision in a later action has a preclusive effect on an earlier action.

. The Second Circuit has held that an issue decided in a later-in-time, non-appealed action can have issue preclusive effect on the prior decision that is on appeal. See Grieve v. Tamerin, 269 F.3d 149, 153-54 (2d Cir.2001) ("The effect of the Southern District’s final judgment was no different simply because the Eastern District action was the first to be ruled on at the district court level.”). However, we have not adopted this variation of the issue preclusion doctrine and should not do so sub silentio.

. I do not address here the government’s argument that the plain view doctrine independently justified its search of the materials seized from CDT. I share some of the majority's concerns regarding broad application of the plain view doctrine to the search of com *1188 puter data in this case. However, there are other contexts where application of the plain view doctrine might be more appropriate. See, e.g., United States v. Wong, 334 F.3d 831, 838 (9th Cir.2003) (applying plain view doctrine to discovery of child pornography in the context of a valid search of a computer for evidence related to a murder investigation). Accordingly, as discussed below, I cannot subscribe to the generalized requirement set forth in Chief Judge Kozinski’s "concurring opinion” that the government foreswear reliance on the plain view doctrine in digital evidence cases or that magistrate judges insist on such a waiver by the government. Conc. Op. at 1179-80.

. Nedrow staled:
The agents, which [sic] some cooperation, limited cooperation from CDT, had identified a set — a subdirectory on an employee’s computer named Tracy [sic ], and this was the drug testing subdirectory with thousands of files, thousands of files on it. And the agents identified it, and they knew some of those files were going to have information definitely authorized for seizure under the Judge Johnson [April 7, 2004] warrant, but they also, frankly, had no ability to say that with respect to every file. Of course not. It’s ridiculous, it’s too large.
So the idea behind taking that was to take it and later briefly peruse it to see if there was anything above and beyond that which was authorized for seizure in the initial warrant. And that’s what Agent Nivitsky [sic ] did, and that’s why Agent Nivitsky [sic ] went to Judge Lloyd in San Francisco, because after perusing it he found some documents that contained information for the players in the case and some lists that contained that information, the ten players, but he also saw other things on there. And he said, okay, there are other things on here that show positive drug tests and that's of interest and as a plain view matter, based on the experience in the case, I know that constitutes possible criminal activity on its face but what I’m going to do is I’m going to get Judge Lloyd’s authorization to seize all these other items.

. Interestingly, the newly minted search protocols set forth in Chief Judge Kozinski's "concurring opinion” make clear that only persons not involved in the investigation may examine and segregate the data.

. The Advisory Committee Notes to Rule 41 state that the rule "avoids an all or nothing approach whereby the government must either return records and make no copies or keep originals notwithstanding the hardship to the owner.” Fed.R.Crim.P. 41, Advisory Committee Notes to 1989 Amendments. Although these notes state that there may be some circumstance under which "equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized,” they further state that the rule, as amended in 1989, “contemplates judicial action that will respect both possessory and law enforcement interests.” Id.

. As noted in the original panel majority's opinion, Judge Illston made no finding that the subpoenas were “oppressive.” Comprehensive Drug Testing, 513 F.3d at 1114 n. 52.

. In the context of a charge of harassment, the Third Circuit has held that the repeated service of grand jury subpoenas on an individual does not constitute harassment that justifies quashing a subpoena. See In re Grand Jury Matter, 802 F.2d 96, 102 (3d Cir. 1986) (citing In re Grand Jury Applicants, C. Schmidt & Sons, Inc., 619 F.2d 1022, 1028-29 (3d Cir. 1980)); cf. United States v. Bell, 902 F.2d 563, 566 (7th Cir.1990) (holding that grand jury witness could not refuse to testify on the grounds that the government allegedly already had the answers to the questions to be asked of the witness).

.Indeed, Quest complied with the subpoena served on it. See Comprehensive Drug Testing, 513 F.3d at 1094.