Per Curiam Opinion; Concurrence by Chief Judge KOZINSKI; Partial Concurrence and Partial Dissent by Judge BEA; Partial Concurrence and Partial Dissent by Judge CALLAHAN; Dissent by Judge IKUTA.
ORDER
The revised opinion filed concurrently herewith shall constitute the final action of the court. No petitions for rehearing will be considered.
PER CURIAM:
OPINION
This case is about a federal investigation into steroid use by professional baseball players. More generally, however, it’s about the procedures and safeguards that federal courts must observe in issuing and administering search warrants and sub *1166 poenas for electronically stored information.
Facts
The complex facts underlying this' case are well summed up in the panel’s opinion and dissent, and we refer the interested reader there for additional information. United States v. Comprehensive Drug Testing, Inc., 513 F.3d 1085 (9th Cir.2008). We reiterate here only the key facts.
In 2002, the federal government commenced an investigation into the Bay Area Lab Cooperative (Baleo), which it suspected of providing steroids to professional baseball players. That year, the Major League Baseball Players Association (the Players) also entered into a collective bargaining agreement with Major League Baseball providing for suspicionless drug testing of all players. Urine samples were to be collected during the first year of the agreement and each sample was to be tested for banned substances. The players were assured that the results would remain anonymous and confidential; the purpose of the testing was solely to determine whether more than five percent of players tested positive, in which case there would be additional testing in future seasons.
Comprehensive Drug Testing, Inc. (CDT), an independent business, administered the program and collected the specimens from the players; the actual tests were performed by Quest Diagnostics, Inc., a laboratory. CDT maintained the list of players and their respective test results; Quest kept the actual specimens on which the tests were conducted.
During the Baleo investigation, federal authorities learned of ten players who had tested positive in the CDT program. The government secured a grand jury subpoena in the Northern District of California seeking all “drug testing records and specimens” pertaining to Major League Baseball in CDT’s possession. CDT and the Players tried to negotiate a compliance agreement with the government but, when negotiations failed, moved to quash the subpoena.
The day that the motion to quash was filed, the government obtained a warrant in the Central District of California authorizing the search of CDT’s facilities in Long Beach. Unlike the subpoena, the warrant was limited to the records of the ten players as to whom the government had probable cause. When the warrant was executed, however, the government seized and promptly reviewed the drug testing records for hundreds of players in Major League Baseball (and a great many other people).
The government also obtained a warrant from the District of Nevada for the urine samples on which the drug tests had been performed. These were kept at Quest’s facilities in Las Vegas. Subsequently, the government obtained additional warrants for records at CDT’s facilities in Long Beach and Quest’s lab in Las Vegas. Finally, the government served CDT and Quest with new subpoenas in the Northern District of California, demanding production of the same records it had just seized.
CDT and the Players moved in the Central District of California, pursuant to Federal Rule of Criminal Procedure 41(g), for return of the property seized there. Judge Cooper found that the government had failed to comply with the procedures specified in the warrant and, on that basis and others, ordered the property returned. We will refer to this as the Cooper Order.
CDT and the Players subsequently moved in the District of Nevada, pursuant to Federal Rule of Criminal Procedure 41(g), for return of the property seized under the warrants issued by that court. *1167 The matter came before Judge Mahan, who granted the motion and ordered the government to return the property it had seized, with the exception of materials pertaining to the ten identified baseball players. We will refer to this as the Mahan Order.
CDT and the Players finally moved in the Northern District of California, pursuant to Federal Rule of Criminal Procedure 17(e), to quash the latest round of subpoenas and the matter was heard by Judge Illston. (The original subpoena, and the motion to quash it that was filed in 2003, aren’t before us.) In an oral ruling, Judge Illston quashed the subpoenas. We will refer to this as the Illston Quashal. See Bryan A. Garner, A Dictionary of Modem American Legal Usage 725 (2d ed.1995).
All three judges below expressed grave dissatisfaction with the government’s handling of the investigation, some going so far as to accuse the government of manipulation and misrepresentation. The government nevertheless appealed all three orders and a divided panel of our court reversed the Mahan Order and the Illston Quashal, but (unanimously) found that the appeal from the Cooper Order was untimely. Upon a vote of eligible judges, we took the case en banc. As luck would have it, none of the three judges on the original panel was drawn for this en banc court. Nevertheless, we rely heavily on their work in resolving the ease now before us.
Discussion
For reasons that will become apparent, we don’t consider the three orders chronologically. Rather, we consider the Cooper Order first, the Mahan Order next and the Illston Quashal last.
1. The Cooper Order
The three-judge panel unanimously held that the government’s appeal from the Cooper Order was untimely. Comprehensive Drug Testing, 513 F.3d at 1096-1101, 1128. We agree with the panel and adopt its analysis of the issue, seeing no reason to burden the pages of the Federal Reporter by redoing the work the panel already performed so well. On that basis, we dismiss the government’s appeal in No. 05-55354.
This does not end our discussion of the Cooper Order, however, because it has substantial consequences for the remaining two cases before us. As Judge Thomas pointed out in his panel dissent, once the Cooper Order became final, the government became bound by the factual determinations and issues resolved against it in that order. Comprehensive Drug Testing, 513 F.3d at 1130. Specifically, Judge Cooper found that the government failed to comply with the conditions of the warrant designed to segregate information as to which the government had probable cause from that which was swept up only because the government didn’t have the time or facilities to segregate it at the time and place of the seizure. Cooper Order at 4. Relatedly, Judge Cooper determined that the government failed to comply with the procedures outlined in our venerable precedent, United States v. Tamura, 694 F.2d 591 (9th Cir.1982), which are designed to serve much the same purpose as the procedures outlined in the warrant. Finally, Judge Cooper concluded that the government’s actions displayed a callous disregard for the rights of third parties, viz., those players as to whom the government did not already have probable cause and who could suffer dire personal and professional consequences from a disclosure of their test results.
The affidavit supporting the first search warrant, the one that sought the drug testing records of the ten suspected baseball players, contains an extensive intro *1168 duction that precedes any information specific to this case. The introduction seeks to justify a broad seizure of computer records from CDT by explaining the generic hazards of retrieving data that are stored electronically. In essence, the government explains, computer files can be disguised in any number of ingenious ways, the simplest of which is to give files a misleading name (pesto.recipe in lieu of blackmail.photos) or a false extension (.doc in lieu of .jpg or .gz). In addition, the data might be erased or hidden; there might be booby traps that “destroy or alter data if certain procedures are not scrupulously followed,” Warrant Affidavit at 3; certain files and programs might not be accessible at all without the proper software, which may not be available on the computer that is being searched; there may simply be too much information to be examined at the site; or data might be encrypted or compressed, requiring passwords, keycards or other external devices to retrieve. Id. at 4. The government also represented that “[sjearching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence.”
By reciting these hazards, the government made a strong case for off-site examination and segregation of the evidence seized. The government sought the authority to seize considerably more data than that for which it had probable cause, including various computers or computer hard drives and related storage media, and to have the information examined and segregated in a “controlled environment, such as a law enforcement laboratory.” While the government did not point to any specific dangers associated with CDT, which is after all a legitimate business not suspected of any wrongdoing, it nevertheless made a strong generic case that the data in question could not be thoroughly examined or segregated on the spot.
Not surprisingly, the magistrate judge was persuaded by this showing and granted broad authority for seizure of data, including the right to remove pretty much any computer equipment found at CDT’s Long Beach facility, along with any data storage devices, manuals, logs or related materials. The warrant also authorized government agents to examine all the data contained in the computer equipment and storage devices, and to attempt to recover or restore hidden or erased data. The magistrate judge, however, wisely made such broad seizure subject to certain procedural safeguards, roughly based on our Tamura opinion. Thus, the government was first required to examine the computer equipment and storage devices at CDT to determine whether information pertaining to the ten identified players “c[ould] be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.”
The warrant also contained significant restrictions on how the seized data were to be handled. These procedures were designed to ensure that data beyond the scope of the warrant would not fall into the hands of the investigating agents. Thus, the initial review and segregation of the data was not to be conducted by the investigating case agents but by “law enforcement personnel trained in searching and seizing computer data (‘computer personnel’),” whose job it would be to determine whether the data could be segregated on-site. These computer personnel — not the case agents — were specifically authorized to examine all the data on location to determine how much had to be seized to ensure the integrity of the search. Moreover, if the computer personnel determined that the data did not “fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized,” the government was to return *1169 those items “within a reasonable period of time not to exceed 60 days from the date of the seizure unless further authorization [was] obtained from the Court.” Subject to these representations and assurances, Magistrate Judge Johnson authorized the seizure.
A word about Tamura is in order, and this seems as good a place as any for it. Tamura, decided in 1982, just preceded the dawn of the information age, and all of the records there were on paper. The government was authorized to seize evidence of certain payments received by Tamura from among the records of Marubeni, his employer. To identify the materials pertaining to the payments involved a three step procedure: Examining computer printouts to identify a transaction; locating the voucher that pertained to that payment; and finding the check that corresponded to the voucher. Tamura, 694 F.2d at 594-95. The government agents soon realized that this process would take a long time unless they got help from the Marubeni employees who were present. The employees, however, steadfastly refused, so the agents seized several boxes and dozens of file drawers to be sorted out in their offices at their leisure.
We disapproved the wholesale seizure of the documents and particularly the government’s failure to return the materials that were not the object of the search once they had been segregated. Id. at 596-97. However, we saw no reason to suppress the properly seized materials just because the government had taken more than authorized by the warrant. For the future, though, we suggested that “[i]n the comparatively rare instances where documents are so intermingled that they cannot feasibly be sorted on site, ... the Government [should] seal[] and hold[] the documents pending approval by a magistrate of a further search, in accordance with the procedures set forth in the American Law Institute’s Model Code of Pre-Arraignment Procedure.” Id. at 595-96. “If the need for transporting the documents is known to the officers prior to the search,” we continued, “they may apply for specific authorization for large-scale removal of material, which should be granted by the magistrate issuing the warrant only where on-site sorting is infeasible and no other practical alternative exists.” Id. at 596.
No doubt in response to this suggestion in Tamura, the government here did seek advance authorization for sorting and segregating the seized materials off-site. But, as Judge Cooper found, “[o]nee the items were seized, the requirement of the Warrant that any seized items not covered by the warrant be first screened and segregated by computer personnel was completely ignored.” Brushing aside an offer by on-site CDT personnel to provide all information pertaining to the ten identified baseball players, the government copied from CDT’s computer what the parties have called the “Tracey Directory” which contained, in Judge Cooper’s words, “information and test results involving hundreds of other baseball players and athletes engaged in other professional sports.”
Counsel for CDT, contacted by phone, pleaded in vain that “all material not pertaining to the specific items listed in the warrant be reviewed and redacted by a Magistrate or Special Master before it was seen by the Government.” Instead, the case agent “himself reviewed the seized computer data and used what he learned to obtain the subsequent search warrants issued in Northern California, Southern California, and Nevada.” Judge Cooper also found that, in conducting the seizure in the manner it did, “[t]he Government demonstrated a callous disregard for the rights of those persons whose records *1170 were seized and searched outside the warrant.”
As previously noted, the government failed to timely appeal the Cooper Order and is therefore bound by its factual determinations and legal rulings. The government also failed to appeal another ruling, by Judge Illston, that ordered return of the Tracey directory and all copies thereof. We will call this the Illston Order. It held unlawful the government’s failure to segregate data covered by the warrant from data not covered by it simply because both types were intermingled in the Tracey directory. In reaching this conclusion, Judge Illston necessarily rejected the argument about the scope of the warrant the government made before Judge Mahan. The Illston Order therefore has preclusive effect on the core legal questions resolved in the Mahan Order, viz., the government’s failure to segregate intermingled data, as required by Tamura.
Issue preclusion attaches when, as here, “the first and second action involve application of the same principles of law to an historic fact setting that was complete by the time of the first adjudication.” Steen v. John Hancock Mut. Life Ins. Co., 106 F.3d 904, 913 n. 5 (9th Cir.1997) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4425 (West Supp.1996)). The determinations in the Cooper and Illston Orders are significant because orders the government does appeal contain similar findings as to the government’s conduct. The government cannot contest those rulings if it is bound by the identical rulings in the Cooper and Illston Orders.
2. The Mahan Order
Like Judges Cooper and Illston, Judge Mahan determined that “[t]he government callously disregarded the affected players’ constitutional rights.” Judge Mahan also concluded that the government “unreasonably] ... refuse[d] to follow the procedures set forth in United States v. Tamura ... upon learning that drug-testing records for the ten athletes named in the original April 8 warrants executed at Quest and at [CDT] were intermingled with records for other athletes not named in those warrants.” We can and do uphold these findings based on the preclusive effect of the Cooper and Illston Orders. However, because the matter is important, and to avoid any quibble about the proper scope of preclusion, we also dispose of the government’s contrary arguments.
A. Compliance with Tamura
The government argues that it did comply with the procedures articulated in Tamura, but was not required to return any data it found showing steroid use by other baseball players because that evidence was in plain view once government agents examined the Tracey Directory. Officers may lawfully seize evidence of a crime that is in plain view, the government argues, and thus it had no obligation under Tamura to return that property. The warrant even contemplated this eventuality, says the government, when it excluded from the obligation to return property any that was “otherwise legally seized.”
Putting aside the fact that Judges Cooper and Illston, whose courts issued the warrants and whose orders are now final, rejected this argument, it is at any rate too clever by half. The point of the Tamura procedures is to maintain the privacy of materials that are intermingled with seizable materials, and to avoid turning a limited search for particular information into a general search of office file systems and computer databases. If the government can’t be sure whether data may be concealed, compressed, erased or booby-trapped without carefully examining the *1171 contents of every file — and we have no cavil with this general proposition — then everything the government chooses to seize will, under this theory, automatically come into plain view. Since the government agents ultimately decide how much to actually take, this will create a powerful incentive for them to seize more rather than less: Why stop at the list of all baseball players when you can seize the entire Tracey Directory? Why just that directory and not the entire hard drive? Why just this computer and not the one in the next room and the next room after that? Can’t find the computer? Seize the Zip disks under the bed in the room where the computer once might have been. See United States v. Hill, 322 F.Supp.2d 1081 (C.D.Cal.2004). Let’s take everything back to the lab, have a good look around and see what we might stumble upon.
This would make a mockery of Tamura and render the carefully crafted safeguards in the Central District warrant a nullity. All three judges below rejected this construction, and with good reason. One phrase in the warrant cannot be read as eviscerating the other parts, which would be the result if the “otherwise legally seized” language were read to permit the government to keep anything one of its agents happened to see while performing a forensic analysis of a hard drive. The phrase is more plausibly construed as referring to any evidence that the government is entitled to retain entirely independent of this seizure. The government had no such independent basis to retain the test results of other than the ten players specified in the warrant.
B. Initial Review by Computer Personnel
The government also failed to comply with another important procedure specified in the warrant, namely that “computer personnel” conduct the initial review of the seized data and segregate materials not the object of the warrant for return to their owner. As noted, Judge Cooper found that these procedures were completely ignored; rather, the case agent immediately rooted out information pertaining to all professional baseball players and used it to generate additional warrants and subpoenas to advance the investigation. Judge Illston found the same. The record reflects no forensic lab analysis, no defusing of booby traps, no decryption, no cracking of passwords and certainly no effort by a dedicated computer specialist to separate data for which the government had probable cause from everything else in the Tracey Directory. Instead, as soon as the Tracey Directory was extracted from the CDT computers, the case agent assumed control over it, examined the list of all professional baseball players and extracted the names of those who had tested positive for steroids. See Comprehensive Drug Testing, 513 F.3d at 1134-35 (Thomas, J., dissenting). Indeed, the government admitted at the hearing before Judge Mahan that “the idea behind taking [the copy of the Tracey Directory] was to take it and later on briefly peruse it to see if there was anything above and beyond that which was authorized for seizure in the initial warrant.” The government agents obviously were counting on the search to bring constitutionally protected data into the plain view of the investigating agents.
But it was wholly unnecessary for the case agent to view any data for which the government did not already have probable cause because there was an agent at the scene who was specially trained in computer forensics. This agent did make an initial determination that the CDT computer containing the Tracey Directory could not be searched and segregated on-site, and that it would be safe to copy the Tracey Directory, rather than seizing the entire *1172 hard drive or computer. After that copy was made, however, it was turned over to the case agent, and the specialist did nothing further to segregate the target data from that which was swept up simply because it was nearby or commingled. The sequence of events supports the suspicion that representations in the warrant about the necessity for broad authority to seize materials were designed to give the government access to the full list of professional baseball players and their confidential drug testing records.
The government argues that it didn’t violate the warrant protocol because the warrant didn’t specify that only computer personnel could examine the seized files, and the case agent was therefore entitled to view them alongside the computer specialist. This, once again, is sophistry. It would make no sense to represent that computer personnel would be used to segregate data if investigatory personnel were also going to access all the data seized. What would be the point? The government doesn’t need instruction from the court as to what kind of employees to use to serve its own purposes; the representation in the warrant that computer personnel would be used to examine and segregate the data was obviously designed to reassure the issuing magistrate that the government wouldn’t sweep up large quantities of data in the hope of dredging up information it could not otherwise lawfully seize. Judge Cooper found that the government utterly failed to follow the warrant’s protocol. Judge Illston also found that the government’s seizure, in callous disregard of the Fourth Amendment, reached information clearly not covered by a warrant. These findings are binding on the government, but simple common sense leads to precisely the same conclusion: This was an obvious case of deliberate overreaching by the government in an effort to seize data as to which it lacked probable cause.
C. Federal Rule of Criminal Procedure 41(g)
Judge Mahan cured this overreaching by ordering the government to return the illegally seized data. We have long held that Rule 41(g) empowers district courts to do just that. Ramsden v. United States, 2 F.3d 322 (9th Cir.1993). Though styled as a motion under a Federal Rule of Criminal Procedure, when the motion is made by a party against whom no criminal charges have been brought, such a motion is in fact a petition that the district court invoke its civil equitable jurisdiction. Id. at 324. We agree with the panel that the district court in this case did not abuse its discretion in choosing to exercise that jurisdiction. Comprehensive Drug Testing, 513 F.3d at 1104.
The government argues that Rule 41(g) is inapplicable because it is not designed to be used as a suppression motion. But CDT and the Players Association are not seeking to have evidence suppressed, as they are not criminal defendants. Rather, by forcing the government to return property that it had not properly seized, CDT is preserving the integrity of its business and the Players Association is protecting the privacy and economic well-being of its members, which could easily be impaired if the government were to release the test results swept up in the dragnet.
Judge Ikuta’s dissent overlooks the crucial distinction between a motion to suppress and a motion for return of property: The former is limited by the exclusionary rule, the latter is not. In United States v. Calandra, 414 U.S. 338, 348 n. 6, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and United States v. Payner, 447 U.S. 727, 728, 735-36 & n. 7, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the Court addressed the sup *1173 pression, not the return, of seized materials — a detail perhaps obscured because the version of Rule 41 then in existence addressed motions to suppress and motions to return in the same subsection. Lest there be any doubt that these are only suppression cases, note that Calandra used the availability of a motion to return, among other remedies, as a reason the exclusionary rule need not apply to grand jury proceedings. See 414 U.S. at 354 n. 10, 94 S.Ct. 613. Payner, which never mentions Rule 41 or a motion to return, simply held that “the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court.” 447 U.S. at 735, 100 S.Ct. 2439. This rule has no relevance here because no motion to suppress, whether based on Rule 41(h) or the supervisory power, is before us.
That Rule 41(g) is broader than the exclusionary rule can no longer be in doubt in light of the 1989 amendments which explicitly authorize a motion to return property on behalf of any “person aggrieved by an unlawful search and seizure of property or by the deprivation of property.” Fed.R.Crim.P. 41(g) (emphasis added). This language was designed to expand the rule’s coverage to include property lawfully seized. See id. advisory committee notes. It goes without saying that lawfully seized evidence may not be suppressed.
The return of seized property under Rule 41(g) and the exclusionary rule serve fundamentally different purposes. Suppression helps ensure that law enforcement personnel adhere to constitutional norms by denying them, and the government they serve, the benefit of property that is unlawfully seized. Rule 41(g) is concerned with those whose property or privacy interests are impaired by the seizure. Suppression applies only to criminal defendants whereas the class of those aggrieved can be, as this case illustrates, much broader.
Most importantly, judicially-imposed restrictions on the scope of the exclusionary rule — itself a judicially-created remedy — are not applicable to orders for return of property which derive their authority from the Federal Rules of Criminal Procedure and their enabling legislation. This is not, in any event, a question properly presented in the ease now before us: What uses the government may make of the Quest evidence during a criminal proceeding must be decided in the context of such a proceeding, when and if criminal charges are brought against any of the players.
Under Ramsden, the district court is required to balance four discretionary factors to determine whether to allow the government to retain the property, order it returned or (as happened in Ramsden) craft a compromise solution that seeks to accommodate the interests of all parties. The Players Association is (1) plainly aggrieved by the deprivation, Fed.R.Crim.P. Rule 41(g), and (2) likely to suffer irreparable injury if it’s not returned. And as the three judge panel recognized, the government has conceded (3) the lack of an adequate remedy at law. Comprehensive Drug Testing, 513 F.3d at 1103.
Judge Ikuta is thus mistaken when she suggests that the Players Association is not entitled to bring the 41(g) motion because it lacks a property interest in the urine samples and other bodily fluids. Ikuta dissent at 1194 n.2. The rule nowhere speaks of an ownership interest; rather, by its plain terms, it authorizes anyone aggrieved by a deprivation of property to seek its return. Here, the Players Association is aggrieved by the seizure as *1174 the removal of the specimens and documents breaches its negotiated agreement for confidentiality, violates its. members’ privacy interests and interferes with the operation of its business. Cf. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458-60, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In any event, we are again bound by the preclusive effect of the Illston and Cooper orders.
The only Ramsden factor fairly in dispute is (4) whether the government showed a callous disregard for the rights of third parties. Judge Mahan concluded that it did- — as did every other district judge who examined the question. There is ample evidence to support this determination, even if the government were not bound by that same finding in the Cooper and Illston Orders. As a factual finding, we review such a determination only for clear error. SEC v. Coldicutt, 258 F.3d 939, 941 (9th Cir.2001). We find none here.
Contrary to our dissenting colleagues’ view of the matter, Ikuta dissent at 1194-96, Rule 41(g) does indeed contemplate that district judges may order the return of the originals, as well as any copies, of seized evidence: “In some circumstances, however, equitable considerations might justify an order requiring the government to return or destroy all copies of records that it has seized.” Fed.R.Crim.P. 41 advisory committee notes (1989 amendments). What circumstances merit this remedy is left to the discretion of the district court in the first instance, and our review of this issue is limited by the Illston Order’s preclusive effect.
Apart from preclusion, however, we cannot see how Judge Mahan abused his discretion by concluding that “equitable considerations” required sequestration and the return of copies. . The risk to the players associated with disclosure, and with that the ability of the Players Association to obtain voluntary compliance with drug testing from its members in the future, is very high. Indeed, some players appear to have already suffered this very harm as a result of the government’s seizure. See, e.g., Michael S. Schmidt, Ortiz and Ramirez Said to Be on 2003 Doping List, N.Y. Times, July 31, 2009, at Al; Michael S. Schmidt, Sosa Is Said to Have Tested Positive in 2003, N.Y. Times, June 17, 2009, at Bll; Michael S. Schmidt, Rodriguez Said to Test Positive in 2003, N.Y. Times, February 8, 2009, at Al. Judge Mahan certainly did not abuse his broad discretion in balancing these equities.
We affirm Judge Mahan on an alternative ground as well: When, as here, the government comes into possession of evidence by circumventing or willfully disregarding limitations in a search warrant, it must not be allowed to benefit from its own wrongdoing by retaining the wrongfully obtained evidence or any fruits thereof. When the district court determines that the government has obtained the evidence through intentional wrongdoing-— rather than through a technical or good faith mistake — it should order return of the property without the need for balancing that is applicable in the more ordinary case.
3. The Illston Quashal
Judge Illston quashed the government’s final subpoena under Federal Rule of Criminal Procedure 17(c), which authorizes quashal if compliance would be “unreasonable or oppressive.” Determining whether this standard is met is committed to the district judge’s discretion, and we will reverse only if that discretion has been abused. In re Grand Jury Proceedings, 13 F.3d 1293, 1295 (9th Cir.1994) (per curiam).
*1175 Judge Illston quashed the subpoena after both the Cooper and Mahan Orders. Judge Illston described the subpoena as “served after the government had obtained evidence ... which has been determined now to have been illegally seized.” Under the circumstances, Judge Illston regarded the subpoena as an unreasonable “insurance policy” — having seized materials unlawfully, the government then subpoenaed the very same materials in an attempt to moot any future proceedings for a return of property. Cf. J.B. Manning Corp. v. United States, 86 F.3d 926 (9th Cir.1996).
It isn’t per se unreasonable to conduct an investigation using both search warrants and subpoenas. E.g., In re Grand Jury Subpoenas Dated Dec. 10, 1987, 926 F.2d 847, 851-55 (9th Cir.1991). But the presence of substantial government misconduct and unlawful seizure of evidence (which was absent from In re Grand Jury Subpoenas) is quite properly taken into account when determining whether a subpoena is unreasonable. Moreover, Judge Illston found that the government’s entire course of conduct had been intended to prevent the Players Association and CDT from litigating the legality of the original subpoenas. This, too, is a valid consideration in evaluating quashal.
For us to reverse a decision as an abuse of discretion, we must have “a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached.” Coldicutt, 258 F.3d at 941. That standard— difficult to meet under any circumstances — cannot possibly be satisfied here, in light of Judge Cooper’s preclusive findings and Judge Mahan’s well-reasoned order. We therefore affirm the Illston Quashal. In doing so, we emphasize that, while the government is free to pursue warrants, subpoenas and other investigatory tools, and may do so in whichever judicial district is appropriate in light of the location of the information sought, it must fully disclose to each judicial officer prior efforts in other judicial fora to obtain the same or related information, and what those efforts have achieved. This is no more than we require of, for example, a prisoner seeking to file a second or successive habeas petition.
More than one of the judges involved in this case below commented that they felt misled or manipulated by the government’s apparent strategy of moving from district to district and judicial officer to judicial officer in pursuit of the same information, and without fully disclosing its efforts elsewhere. The cause of justice will best be served if such judicial reactions to the government’s conduct can be avoided in the future.
Concluding Thoughts
This case well illustrates both the challenges faced by modern law enforcement in retrieving information it needs to pursue and prosecute wrongdoers, and the threat to the privacy of innocent parties from a vigorous criminal investigation. At the time of Tamura, most individuals and enterprises kept records in their file cabinets or similar physical facilities. Today, the same kind of data is usually stored electronically, often far from the premises. Electronic storage facilities intermingle data, making them difficult to retrieve without a thorough understanding of the filing and classification systems used-something that can often only be determined by closely analyzing the data in a controlled environment. Tamura involved a few dozen boxes and was considered a broad seizure; but even inexpensive electronic storage media today can store the equivalent of millions of pages of information.
*1176 Wrongdoers and their collaborators have obvious incentives to make data difficult to find, but parties involved in lawful activities may also encrypt or compress data for entirely legitimate reasons: protection of privacy, preservation of privileged communications, warding off industrial espionage or preventing general mischief such as identity theft. Law enforcement today thus has a far more difficult, exacting and sensitive task in pursuing evidence of criminal activities than even in the relatively recent past. The legitimate need to scoop up large quantities of data, and sift through it carefully for concealed or disguised pieces of evidence, is one we’ve often recognized. See, e.g., United States v. Hill, 459 F.3d 966 (9th Cir.2006).
This pressing need of law enforcement for broad authorization to examine electronic records, so persuasively demonstrated in the introduction to the original warrant in this case, see pp. 1167-68 supra, creates a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant. The problem can be stated very simply: There is no way to be sure exactly what an electronic file contains without somehow examining its contents — either by opening it and looking, using specialized forensic software, keyword searching or some other such technique. But electronic files are generally found on media that also contain thousands .or millions of other files among which the sought-after data may be stored or concealed. By necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there.
Once a file is examined, however, the government may claim (as it did in this case) that its contents are in plain view and, if incriminating, the government can keep it. Authorization to search some computer files therefore automatically becomes authorization to search all files in the same sub-directory, and all files in an enveloping directory, a neighboring hard drive, a nearby computer or nearby storage media. Where computers are not near each other, but are connected electronically, the original search might justify examining files in computers many miles away, on a theory that incriminating electronic data could have been shuttled and concealed there.
The advent of fast, cheap networking has made it possible to store information at remote third-party locations, where it is intermingled with that of other users. For example, many people no longer keep their email primarily on their personal computer, and instead use a web-based email provider, which stores their messages along with billions of messages from and to millions of other people. Similar services exist for photographs, slide shows, computer code and many other types of data. As a result, people now have personal data that are stored with that of innumerable strangers. Seizure of, for example,- Google’s email servers to look for a few incriminating messages could jeopardize the privacy of millions.
It’s no answer to suggest, as did the majority of the three-judge panel, that people can avoid these hazards by not storing their data electronically. To begin with, the choice about how information is stored is often made by someone other than the individuals whose privacy would be invaded by the search. Most people have no idea whether their doctor, lawyer or accountant maintains records in paper or electronic format, whether they are stored on the premises or on a server farm in Rancho Cucamonga, whether they are commingled with those of many other pro *1177 fessionals or kept entirely separate. Here, for example, the Tracey Directory contained a huge number of drug testing records, not only of the ten players for whom the government had probable cause but hundreds of other professional baseball players, thirteen other sports organizations, three unrelated sporting competitions, and a non-sports business entity— thousands of files in all, reflecting the test results of an unknown number of people, most having no relationship to professional baseball except that they had the bad luck of having their test results stored on the same computer as the baseball players.
Second, there are very important benefits to storing data electronically. Being able to back up the data and avoid the loss by fire, flood or earthquake is one of them. Ease of access from remote locations while traveling is another. The ability to swiftly share the data among professionals, such as sending MRIs for examination by a cancer specialist half-way around the world, can mean the difference between death and a full recovery. Electronic storage and transmission of data is no longer a peculiarity or a luxury of the very rich; it’s a way of life. Government intrusions into large private databases thus have the potential to expose exceedingly sensitive information about countless individuals not implicated in any criminal activity, who might not even know that the information about them has been seized and thus can do nothing to protect their privacy.
It is not surprising, then, that all three of the district judges below were severely troubled by the government’s conduct in this case. Judge Mahan, for example, asked “what ever happened to the Fourth Amendment? Was it ... repealed somehow?” Judge Cooper referred to “the image of quickly and skillfully moving the cup so no one can find the pea.” And Judge Illston regarded the government’s tactics as “unreasonable” and found that they constituted “harassment.” Judge Thomas, too, in his panel dissent, expressed frustration with the government’s conduct and position, calling it a “breathtaking expansion of the ‘plain view’ doctrine, which clearly has no application to intermingled private electronic data.” Comprehensive Drug Testing, 513 F.3d at 1117.
Everyone’s interests are best served if there are clear rules to follow that strike a fair balance between the legitimate needs of law enforcement and the right of individuals and enterprises to the privacy that is at the heart of the Fourth Amendment. Tamura has provided a workable framework for almost three decades, and might well have sufficed in this case had its teachings been followed. We have updated Tamura to apply to the daunting realities of electronic searches.
We recognize the reality that over-seizing is an inherent part of the electronic search process and proceed on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records. This calls for greater vigilance on the part of judicial officers in striking the right balance between the government’s interest in law enforcement and the right of individuals to be free from unreasonable searches and seizures. The process of segregating electronic data that is seizable from that which is not must not become a vehicle for the government to gain access to data which it has no probable cause to collect.
The appeal in No. 05-55354 (the Cooper Order) is dismissed as untimely.
*1178 The judgments in Nos. 05-15006 (the Mahan Order) and 05-10067 (the Illston Quashal) are affirmed.